Good morning, ladies and gentlemen. Before we start this morning, I simply want to announce for the record that we are also here with Judge Alana Rovner, who is appearing remotely. You will see her on the little monitor on the stand, and Judge Sykes and I can see her from where we are. So just take a minute. Sometimes the transmissions aren't quite as quick as we would like, in case she has a question to ask. So we will now proceed to the first case for this morning, which is Payne Center v. Origin Healthcare. Mr. Brand. May I please the Court? My name is Vaulding Brand, counsel for the appellant's Payne Center. Symed, the district court, erred when it ruled that the statute of limitations barred all of plaintiffs' contract claims. Symed argued that the four-year UCC statute of limitations applied to all of these claims, but first they had to show that the contract or the transactions that issued involved a sale of goods. In order to do this, they had to show that the software licenses at issue were not customized to meet plaintiff's specific needs. Is it just customization, or is it really the predominant thrust that needs to be satisfied under Indiana law? Well, at first there needs to be a recognition that there's a sale of goods involved. In order to do that, they need to show that the software licenses under the relevant law were not customized to meet the specific needs of the plaintiffs. And in this case, they relied entirely upon a reference to a footnote citation from Joy Decker, a sales representative who simply stated that she didn't think the software licenses were that customizable. Without question, that was pure speculation and not competent summary judgment evidence. And on that grounds – Well, what evidence did you have that they were customized? The reason I ask the question about predominant thrust is if customization is one factor in ascertaining predominant thrust, that's one thing. If, as you seem to be saying, it's a first step that needs to be passed, I don't see a lot of evidence in this record, but maybe you can point me to some, of customization. It seems like it's an off-the-shelf management tool that can be used by any medical practice. Okay. And with respect to the predominant thrust, Payne Center argued, and I believe both parties conceded, that that came into play if there was a mixed contract involved. But with respect to the customization, plaintiffs presented testimony that the software licenses, and specifically practice manager, was designed to meet the plaintiff's specific billing needs, and there was reference to that testimony. So you think mixed contract isn't enough? I mean, I could imagine a mixed contract that has standard software plus services. I could imagine a mixed contract that has customized software plus services. Aren't they either way a mixed contract? I would agree if the software licenses were established as a good initially, meaning that the software licenses were not customized, that this contract would involve, that this transaction would involve a mixed contract. And what would that do to your statute of limitations? Well, plaintiff's position is that Simon completely failed to address the mixed nature. Assuming they had established that a good was involved in this contract, they completely failed to address the mixed nature in their opening brief. Plaintiffs clearly argued that there were deficient services, and they were suing based on that, but Simon didn't even address it. And this court's precedent is that when you fail to move on that grounds in your opening brief, that argument is waived. But out of an abundance of caution, plaintiffs still produced evidence to the district court that was not recognized that eMERGE was customizable. In fact, Joy Decker, the same representative they cited to, said that eMERGE was more customizable than practice manager. So it was clear that it was customizable. In addition, we showed that the services did predominate, although we argued that we didn't have the burden of persuasion on that issue, and so it was unnecessary. But we argued that the software licenses could not be even sold without support services that were ongoing for the duration of the nine-year period these parties were in contract together, and that Simon marketed themselves as a service provider with complementary software, and that the primary purpose of the entire transaction, as evidenced by their own sales representative as well as plaintiff's 30B6 representative, was that Simon was to provide services to make sure that the claims were submitted. Well, I understand that it was Simon's responsibility actually to make that final transmission to the insurance company, right? So I would assume that would have been one of your primary points. Can you talk to me a little bit about this client center and the evidence that would show how pain centers employees were trained for it, how it actually revealed or didn't reveal problems? Sure. The testimony in this case showed that there were deficiencies in the client center, such that there may be claims that show up on the client center. There may be claims that weren't shown in the client center. In that first week of training that you got on the first software package, the project manager software, were the pain center people trained to use client center or told about it or in any way? No. The pain center, I believe, the way that the training worked, there was about a three- or four-day training period. On the very last day, I believe their representative, Amy Kiernan, testified that claims were submitted and that there were no errors. And so one of the key points in this case was that there were errors that were uncorrected in the client center. But she testified she didn't train on it because she didn't see any errors. And so a plaintiff's expert articulated that it's an impossibility to train on the client center under those circumstances because the insurance carriers don't even respond for a certain number of days after that training would have ended. And so one of the key functionalities that plaintiffs should have been trained on, they were not, which is a basis for one of the contractual theories that we've articulated. So whose problem is that? I mean, I guess if pain centers never told about client center and never trained on it, then I can see that you might have an argument that there's no reason you would have known to dig into it. But you did have an employee, Ms. Harmon, who eventually figures out how to use it, right? We argued that she did not ever utilize the client center. And I believe Simon pointed to her equivocation throughout the different excerpts of the deposition. I thought she eventually says that she could use it, though. I'm not clear about when, but I thought she eventually figured it out. Yes. Like I say, I believe there was equivocation. There were points where she said that she didn't use it. There were points where she said she did use it. But beyond that point, in going back to the UCC, the plaintiff's position is that even if the UCC were to apply, that the claims that clearly were brought within that UCC's four-year statute of limitations period were not time-barred. We have a contractual relationship from 2003 to 2012, and the suit was brought in January of 2013. So even if the four-year UCC statute of limitations period applied, there's no basis in law to suggest that proves that those claims should be time-barred. But there's only one purchase, well, two purchases, one per product. And if you're thinking of it as goods, it's not like you kept repurchasing the product. I can certainly see the services are rendered over time, but that's not the UCC theory. I mean, you bought Project Manager in 2003. You bought the eMERGE in 2006, and those are the only two purchases, right? Those were the only two purchases, but it's also important. Of goods, at least. Let's assume goods. And even if we assume that they're goods, plaintiffs also articulated that these were software licenses, which meant that they were constantly updated and modified. They were dynamic in nature. So the software license that you may have purchased in 2003 was constantly updated and modified in such a way it was not the same existing software package throughout the relevant time period. Do we have evidence in the record that shows modifications to the license? I don't believe that there was a contest on that point, but I would have to think on that for a second, to be honest with you. Are you saying that there was new software that differed in some material respect during those four years? See, if we assume that a four-year period of limitation is in effect, what I've been trying to figure out is what actions did the defendants take during those four years to cause plaintiffs' losses? You know, was there new software that differed? Was there new defective training? Because it certainly, well, the software and training that caused the problem were in place as of 2003 for practice manager and then 2006 for, you know, eMERGE, I guess, E-M-R-G-E. Yes, that's correct, eMERGE. No, that's my question. Okay. So the way the software license, the purpose of the license was to allow the claims to be submitted in a zip file to SIMAD. And so SIMAD had a continuing ongoing duty to take those claims that were in the zip file, submit it to the insurance carrier. Plaintiffs articulated that after receiving these claims, there's no argument that they didn't receive the claims. Plaintiff's argument is that the claims were not then submitted properly to the insurance carriers. And so throughout the relevant time period, they had claims that they were in receipt of that they continuously failed to submit to the insurance carriers. So we have basically two theories. Your theory is that you get them to SIMAD. Correct. But then somehow they get stalled at SIMAD and they don't go on. Whereas I understand their theory to be that they get to SIMAD, SIMAD transmits to the insurance company, but the insurance company won't process it because there's a mistake in coding or there's a mistake in the birthday or there was some sort of flaw in the record. So how do we figure out which of those it is? Well, actually, Mark Anderson, the expert, addressed this point as well. I mean, what he showed was SIMAD's own submission history reports showed that all the claims were never submitted. And he also showed that of the claims that were submitted, there were claims that were not corrected or processed, and that SIMAD, based on all the parties' uncontested representations, failed to notify plaintiffs of those. And so plaintiffs articulated theories for breach of those contractual services throughout the relevant time period, as well as project misrepresentation. And so isn't SIMAD's theory that they did notify by putting it in the client center? And your theory is that that's not enough notification? I just want to make sure I know what people are arguing. Yes, and that theory is flawed as well because the claims that were supposed to have been in the client center, first of all, they never produced that information in the summary judgment. So we have no evidence that this was ever produced. That's pure speculation that it ever existed. Second of all, their own representatives, who would have undoubtedly had access to this information, plus more on the back end, apparently they weren't aware of information that plaintiffs could have utilized because they actively misrepresented that the claims were properly submitted, which is why plaintiffs also articulated claims for fraudulent misrepresentation and fraudulent concealment because they actively misrepresented the status of the claims, where they were, and whether they were properly processed. Well, we also have Dr. Alexander's testimony in the 30B6 deposition that the problems with this claims billing system were readily apparent from the very beginning, immediately after the initial software licensing agreement was entered into in 2003 and then when the eMERGE licensing agreement was executed in 2006. And so your client is admitting as the 30B6 representative of the plaintiff that he was aware of the problems with this system and was on, at the very least, constructive notice of a contract breach, that these systems weren't living up to their billing of a contract breach and a potential fraudulent inducement claim. And the fact that he didn't perhaps know the full extent of it or the reasons for it doesn't have any effect on the claim accrual determination. If he was aware that they weren't living up to their billing, the claim accrues then. So you need that 10-year statute of limitations to govern here. Well, I would first argue that if it was true that he was just simply trying to figure out the extent of the damage, the claims would accrue at that point. However, the testimony, the question that he was asked was when did he experience some of these issues. He testified in the beginning. And when he said in the beginning, he was testifying as to transactions that were not, that simply needed to be resent. That does not provide notice that he was harmed by any losses, number one. Number two, he also didn't testify. That's not a statute of limitations principle. You don't have to know the full extent of the harm. You just have to know that you've got a claim for breach of contract or a claim for fraud, that the product and services are not living up to their billing, and that the defendant misrepresented how well they would perform. And with his admission that he was aware that this software and the companion services weren't performing seems to me to trigger the statute of limitations. And then your fallback argument is that the 10-year statute applies, and that gets us back into the predominant thrust test. But I would first argue that there's nothing in the record that shows that he was aware of that at that time. He was testifying. Oh, wait. Forgive me, because in the district court opinion, at page 13, there is some deposition testimony that certainly seems to indicate that Alex Bender was aware of the problems with Practice Manager well before 2012, and that he knew before 2006 that claims were not being paid. And that he actually discussed this with Deckard. I guess she was known as King at that time, who admitted there were problems and encouraged him to call the help desk. So why wouldn't that alone establish knowledge? Because this circuit has said that what is relevant, I believe, under Dabrow v. Kalu, is that there needs to be knowledge of the injury before the court. And the injury before the court was not simply having to resubmit a claim that may have not been received the day of when you questioned whether or not it was received. The issue was whether or not the claims were lost and that there were losses. And so there wasn't a single claim by a single insurer for a single amount that he was aware of that was lost as a result of having to simply resubmit the claim. He had to resubmit the claim. So, in other words, he knew that he transmitted the claims to Simon. And there were times where his staff questioned whether or not the claims were received. And if they said no, they resent them. But there's also abundant testimony in the record that shows that none of his billing staff, Mellencamp nor Harmon, were aware that Simon caused him a single penny of losses before 2012. There was evidence in the record that plaintiff's 30B-6 representative testified before a bankruptcy petition in 2010 that he was not aware of any losses that could be attributed to Simon. There was testimony from his former medical providers that said that he was not aware. And at minimum, this creates a fact question as to what his level of knowledge was. But we would argue that based on all of the record evidence, there's only really one reasonable inference that could be drawn, which is they had no knowledge whatsoever that Simon was losing claims. They knew they had to submit claims occasionally. And this circuit has also said that probabilistic injury does not start claims accrual. So even if in the beginning, at some unknown date and time, in 2003, he came to question whether or not there was a claims loss, that did not start the claims accrual for any point beyond that point, or beyond that date, or beyond that day of observation. And there's just no factual – there's too many factual questions that can be drawn from this testimony to suggest that there's only one reasonable inference, that he knew that when Simon was continuing to say that we've processed your claims correctly and that we would notify you if your claims were permanently lost or needed to be corrected when this did not occur, that he had knowledge, or anybody in his practice had knowledge, that the claims losses caused him to suffer injury, especially when there was a roughly 30 – from a 30-day to one-year window when claims could be presented to insurance carriers. Okay. You're in your rebuttal time if you would like to save a little bit, but it's up to you. Oh, I'm sorry. I just would like to say this additional point. With respect to the claims accrual for the tort claims, we would also argue there's no knowledge of any ascertainable harm that could be attributed to Simon and that any claims within the statute of limitations period again, within the six years, for the fraud claims would not be time-barred. And we also move for summary judgment in our opening motion that should have been granted on the basis that there was no contest factually, that they failed to submit thousands of claims to the insurance, there was no contest that they failed to train on key functionalities, that the software was materially dissimilar, that there were promises that these claims, I mean that the software services and the software licenses would insure against claims losses and that plaintiffs were damaged in amount of $15 million as evidenced by Mark Anderson's expert report, in addition to other losses. So for that reason, we would argue none of the claims are time-barred. All right. Thank you. Mr. Craig. Thank you, Your Honor, and may it please the court. The district court below properly dismissed all the plaintiff's claims, both under contract theories and tort theories, as time-barred. You know what bothers me most about the facts from your side is this seems to me, under a predominant thrust idea, a contract that I'll just say, at the very least, has a very significant services component to it. You have a PsyMed employee testifying that a client, even with this kind of contract, I know they're the two kinds, but even with this kind, can't transmit the claims directly to the insurance provider. And there's even a charge in the contract, a monthly charge for the services, which after about three years exceeds the initial price for the license. So it seems at a summary judgment stage, there are some significant facts in the record that would point toward services, and indeed not services for the payment of money, but the general services that yield the 10-year statute. Yes, Your Honor. We believe the district court properly found the predominant thrust was the provision of software. Why do you say that when the software isn't doing anything until the claim is submitted and you're submitting the claim? Well, the software is doing a lot before that claim is submitted. But just for the sake of doing it. No, the purpose of the software is to facilitate payment. And payment doesn't happen until you submit the claim. The insurance company doesn't know somebody went to pain center. That's correct. And at that final step, there is the transmission to the insurance company. However, as part of the overall use of the software, there is data entry at the client level by pain center or pain medicine rehabilitation center throughout that process. So they submit that. They enter all that relevant information into the software. That's not done by payment. No, I understand. And then it gets sent to you in this zip drive or whatever it's being sent in. I don't think we have any disagreement about what happens. I think it's a question of what's critical. Right. And I think, again, the... The technical reasons, I'm not sure I can speak to. I mean, I think there was some gateway between SciMed and the insurance companies that the clients were using. So a service. It is part of what was purchased as a service. However, coming back to the predominant purpose of it, again, the use of the software is really, except for that transmission step, controlled by the client. It's contained at the client's office. Right. The client does the inputting, which stands to reason given what we're talking about here. It's a billing system. But the contract basically says you use our software. We'll license you to use our software, and we'll submit your claims for you. So it's plainly a mixed contract for a good plus services. And the question is, what's the predominant thrust? Is this a billing system or the billing services are the predominant purpose of the contract? Or is it really mostly just the sale of the software or the licensing of the software? And the district court didn't even address this. The district court made a mistake and applied the 6-year statute or said that the only default, if the UCC doesn't apply, would be the 6-year statute of limitations and didn't address the predominant thrust test at all because he thought that under either the 4-year UCC statute of limitations or the 6-year, the claims would be time-barred. But if it's the 10-year statute of limitations, which applies to written contracts, the 6-year statute plainly does not apply here as a matter of law, then these claims are timely, even assuming the earliest possible accrual date, 2003, right after the contract was signed, when Dr. Alexander was aware that the system wasn't performing. And in 2006, after the eMERGE program was licensed and failed to perform as promised. So we do need to identify what the predominant thrust of the contract here is, and the district court did not engage in that analysis. And can I just put one sort of footnote to that? And also we need, I think, some sense of the extent to which that decision is driven by facts, which might be disputed, or on the other side, the extent to that, that that decision is simply a question of law, that the district court was going to decide or that we could decide. Because it seems to me there may be a lot of facts going into what's the predominant thrust. I believe the undisputed fact. Could I add one more footnote? I'm sorry to pile on. Not at all. Even if the UCC limitation period applies, why would plaintiffs not be entitled to damages that were sustained during the last four years of the use of the software? I mean, would you concede that they're at least entitled to damages within that period? So maybe we'll give you a minute. First, if you can do this in order, you can answer Judge Sykes' question, my modification, and then Judge Rovner's. Certainly. So the factual record that was developed in the district court does show that the predominant purpose of this contract was for the provision of this standardized software rather than services. Why do you say that? I say that because there were two options for clients. There were clients who essentially bought billing services from SCIMED, and that means they simply gave some information to SCIMED, and SCIMED was responsible for getting that information in the appropriate form, making sure the forms were all filled out correctly, following up with the insurance companies, et cetera. Here, the only service SCIMED provided to Payne Center was really this final automated step, really done by the software, where the claims are transmitted. You could look at it. I could certainly give you that one is a services contract and the other is a software contract, but you could also look at it as one is an expensive services contract and the other has much more of a do-it-yourself element to it, and yet it's still a services contract because SCIMED is taking the only step that they care about, which is the step that gets them their money. That's the point of keeping these billing systems and going to the insurance companies. Sure. I would answer it for two reasons. It's still a contract for the provision of software predominantly. Again, the transmission is really done by the software. It's not a hand process. It's not a customized process where the employees of SCIMED are really actively engaged in that. How does it work then? Can you explain to me in more detail? So they send – I don't know how they transmit it. Let's assume by some sort of email or something. I don't know whether it's an upload to a cloud, but they transmit the file with claims, and how does it get received at the SCIMED end? It's received apparently as a zip file with these individual files to go to different insurance companies, and from SCIMED it is then transmitted to the insurance company. But how does that happen? How does it lodge somewhere in SCIMED, and what's the process of unzipping it and figuring out which insurance companies to send things to? I believe what was indicated in the record was that SCIMED has some kind of automated notification, and then it runs through this process to determine – the software runs through a process to determine if there are any errors, incorrect, anything that would obviously prevent the transmission to the client. If there is, then Payne Center or the other systems clients are responsible for correcting that. If not, it's then transmitted to the insurance companies through some secure channel that SCIMED has. There's no human agent involved in this process? That's a little scary. Well, I'm sure there are human agents at some point who can intercede if there's some kind of a problem, perhaps. But again, in terms of checking the forms and the transmission, it's a computerized process going over the Internet through some connection to the insurance company. I need to simplify this for my own well-being. Does the practice manager software that is sold to the plaintiff, does it communicate claims directly to insurance companies or do the claims pass through additional software at SCIMED before reaching insurers? I'm trying to understand how this software works and also to determine, I'm trying to determine whether the monthly fee was because SCIMED was processing of claims. Do you see my problem? I understand, Your Honor, and the monthly fee covered a number of things, including telephone support. So, for example, when there was a call to the help desk, it did cover the transmission of these files. It was about $250 a month. I believe that's correct, yes. And that transmission did occur through the practice manager system, albeit on the server hosted by SCIMED rather than on the client computer at the pain center. You can see that that would be a great service to a small medical practice like pain center, not to have to deal with some large number of insurance companies but to just send one consolidated file to a service provider who can then fan them out as need be. It is, but the ultimate responsibility for following up with the insurance providers and for correcting any errors in the insurance claims remains with the client, in this case pain center. But that was one of the issues here because one of the disputes that I picked up trying to work my way through this was a dispute about the, number one, SCIMED's duty to notify a client that there was a problem in transmission, what methodology SCIMED uses to notify, whether everybody was on the same page about that, whether you just dump it into this client center limbo or whether there's actually some real notification. The record strikes me as very messy about that. The method for notifying the clients, as you indicated, was the client center. Ms. Kiernan did train. But she didn't train, as it turns out. She didn't have time to train, or she didn't have the right factual setup, I guess. Well, she was not able to train on the actual data. She did, and I believe Ms. Mellencamp, who is the office manager, testified that they did understand the functionality of the client center. And importantly, Harrietta Marie Harmon, who was the billing specialist from, I think, 2003 to 2011, testified that she used the client center extensively and that she understood it was the pain center's responsibility to correct errors, to follow up with insurance companies. As she put it, we were responsible for working those clients. But her testimony is vague about when she came to achieve this competence, whether it's before or after 2007. I mean, it seems that they were sort of left on their own to figure this out, and she clearly didn't understand it fully because the number of claims that PsyMed didn't follow through on is tremendous. This company eventually goes to a different provider, and their financial picture has transformed. I believe Ms. Harmon did understand, really, throughout the functionality. Ms. Pierce, who came to pain center in 2012, testified she was not initially aware of the client center, its functionality, but when she called PsyMed and they explained to her how it worked, she indicated that there was approximately an 18-month backlog of claims, apparently from the time that Ms. Harmon left to the time Ms. Pierce began working at Pain Medicine Rehabilitation Center. So Ms. Harmon testifies, though, that she can't recall if she's making these changes to bounced submissions before 2007. So I'm not sure that you can pull it all the way back to 3. She may not recall, but really, the client center is kind of the heart of the error correction process, and when it's not used, as in 2012, there is an enormous backlog of claims, and Ms. Harmon never indicated, as Ms. Pierce did, that this large backlog had developed. Now, the client center, too, is what somebody referred to as technology lasagna? I don't know that that refers specifically to the client center. I think it's talking about the various layers of... And as I recall, that expression was used by Jennifer Burke, who was a software analyst and troubleshooter, worked at the help desk for a while as well, and I think she was referring to just the various layers that are involved in a program like this. And I think, again, she's looking at it from the programming and analysis standpoint rather than the user standpoint. That just serves to establish that what pain center and other small medical practices are buying from your company is IT services, not just a box with software in it, and that the services are what they're bargaining for. The software is just the platform for the billing services that you're providing. And that makes sense in this context. A small medical practice wouldn't want to maintain a large IT staff to do this. They're responsible for the billing inputs, in other words, getting the medical coding right for the insurance company, and then fixing it if it's wrong. But you're responsible for everything else. Right, I think that what pain center, I'm sorry, what PsyMed was responsible for was maintaining and upgrading the software. So in the same way that... Troubleshooting IT glitches. Right, so in the same way when you buy... Training. Exactly. Microsoft Windows or Microsoft Office, there are periodic updates, there's a help desk, you can ask for that service as well, and there's a constant back-end updating of that software. They're buying much more than that from you. This is not analogous to a consumer purchase of Windows. It's just not, despite the periodic updates and the potential to buy a service contract. They're buying your IT expertise to get the bills submitted to the insurance company so they don't have to do it directly. But the IT expertise is really the software. That's what provides the conduit to the insurance companies. And the IT expertise is exercised through maintaining and supporting that software, but it's not the same level of service you would have if you replaced your billing department with PsyMed. Oh, right, there's two different packages that a medical practice can buy from you. One is the whole shebang. They can buy the software plus your client's services and perform all of their billing, inputs and outputs and collections, right? I mean, that's the full-service client service package. This is a systems client package, but they're still buying services from you. Let's assume that we can conclude that, like the district court, this is a mixed contract for goods and services and that services predominate. You're no longer maintaining that the 6-year statute of limitations applies. No, Your Honor, it appears that the 10-year statute would apply. Right, that's something the district court injected himself, and that was a mistake. It was not argued below. The district court did say that, but the argument below was about whether the UCC applied. So you concede the 6-year statute doesn't apply for contracts? It does not appear this is a contract like a promissory note, Your Honor. Okay, so if the 10-year statute applies, then at least the contract claims are not time-barred because the earliest possible accrual date, from your standpoint, would be soon after the initial licensing agreement was entered into in 2003 and soon after the emerged licensing agreement was entered into in 2006. If the 10-year statute applies, then the lawsuit filed January 2013 would be timely under the 10-year statute. We have a number of tort claims, fraud, fraudulent inducement, tortious interference with contract. Those are subject to the fraud claims 6-year statutes and then the other tort claims 2-year statutes. Correct. So the viability or timeliness of those depends on the continuing wrong doctrine, I think? The continuing wrong doctrine or the discovery rule, we think it's clear that this does not follow into the continuing wrong doctrine. I mean, the alleged problem here is inadequate software and misrepresentations about the software, but the doctor's own testimony reveals that he knew in 2003 even that there were problems with practice manager. He was very vocal about those with PsyMed. For example, the tortious interference claim, he contends he called PsyMed in 2005 to complain about his inability to purchase an MRI because he wasn't getting his claims paid and said I need to get my claims paid. He even said that after the first full quarter of using the software, the accounts receivable had dropped so much or the accounts actually paid had dropped so much that he was not able to get a bank loan and he said all of a sudden I'm losing money like crazy. So he clearly knew despite whatever he contends PsyMed may have represented to him. There are two guilty parties potentially, right? The insurance companies and PsyMed. So how is he supposed to sort out when they're both pointing fingers at each other? Well, I think because he actually investigated with both parties. He hires all sorts of people over the years. He finally finds somebody in 2012, but it's apparently not that easy to find out. Well, I think he was informed by insurance companies that they had not received submissions. And so if they have not received submissions, then I think it's pretty clear where the problem is if that was the problem. And I see my time is up, Your Honor, but we would ask the district court to be informed. All right. Thank you. Oh, excuse me. I think maybe Judge Roberts has one more question. Before you go, the court used the monthly cost for services in assessing whether the goods or services predominated. But the plaintiff has pointed out to us that the total service cost over the life of the contract exceeded the cost of the licensee in the case of practice manager by a rather large margin, which figure should the court have used, the monthly service charge or the total service cost over the life of the contract? We believe the district court properly used the monthly service charge, showing that there was a relatively modest provision of services in the course of any month as compared with the license of the actual software product. Aye. It seems like different things, so you'd have to amortize the cost of the license, then, over the full life, expected life of the license, which would pull that number way down. It could, Your Honor. It would, as a matter of fact. If it were spread over time, it would. It apparently was not, and so, again, we think based on the predominant thrust, it was contract for goods. Thank you. All right. Thank you. I think you have a minute left, Mr. Brandt, and we'll let you use that minute. I'd just like to briefly say that most of the arguments in regards to why the UCC should apply came after their motion for summary judgment. A lot of these arguments plaintiffs weren't even allowed to address into the reply briefing for those reasons the UCC should not apply. I would also argue that with respect to the tort claims, some had argued that Dr. Alexander at Payne Center came to believe that practice manager was not working. That's not enough to start claims accrual. For tort claims under the Evanston case, there would be no basis to bring a lawsuit for the specific elements necessary for a tort claim, and so none of the tort claims accrued based on the evidence presented. And then, lastly, we'd like to say that Dr. Alexander did testify that he had to resubmit claims, but there was no knowledge that he had lost money that could be attributed to Simon. And as this court pointed out, there were multiple players in this factual scenario, and there was just no knowledge that Simon was the cause prior to 2012. For those reasons, we ask that the district court's time bar decision be reversed and that plaintiff's motion for summary judgment be granted. All right. Thank you very much. Thanks to both counsel. We will take the case under advisement. And before we move on to the second case, I understand we need to adjust the cameras a little bit, so we will do that and then move on. Thank you so much. Thank you. We'll move on to our second case for this morning, Michael White against Stephen Heffernan.